In re the **RENFREW CENTER OF FLORIDA INC., Debtor.**

In re the **RENFREW CENTER, INC., Debtor.**

**Bankruptcy Nos. 96–10246 SR, 96–10245 SR.**

United States Bankruptcy Court, E.D. Pennsylvania.

May 6, 1996.

Frederic J. Baker, Asst. U.S. Trustee, Office of the U.S. Trustee, Philadelphia, PA.

R.H. Levin and Robert M. Bovarnick, Adelman Lavine Gold and Levin, Philadelphia, PA, for Debtors.

Jay G. Ochroch, Paul J. Brenman and Michael G. Menkowitz, Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA, for Corestates Bank.

Todd Alan Ewan, Saul, Ewing Remick & Saul, Philadelphia, PA, and David Hope, Stradley, Ronon, Stevens & Young, Philadelphia, PA, for Official Unsecured Creditors Committee.

## OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

### Introduction.

Before the Court are contested Applications by the above two Chapter 11 Debtors to employ the law firm of Adelman, Lavine, Gold and Levin as bankruptcy counsel. The principal objection interposed has been lodged by the Debtors' principal secured creditor, Corestates Bank, N.A., and goes to the proposed source of funds for the payment of legal fees, as opposed to the general propriety of counsel's retention. A hearing was held February 15, 1996. At this hearing the United States Trustee, which took no position on the Bank's objection, verbally raised as a potential additional issue the possibility of a conflict of interest on the part of counsel in the representation of these affiliated Chapter 11 Debtors. Both issues have subsequently been briefed by the Debtors and the Bank and the matter is ripe for disposition. For the reasons discussed herein, the Objections will be overruled and the Applications will be granted, with permission given to Debtors' counsel to hereafter apply certain pre-petition retainers paid to it against fees which are hereafter allowed by the Court upon presentation of a fee application pursuant to 11 U.S.C. § 330.

### Background.

The instant dispute involves the increasingly common and frequently difficult question of the relative rights to a pre-petition retainer fund as between a debtor's bankruptcy counsel and its pre-petition secured lender. *See generally,* Steven H. Nickles and Edward S. Adams, Tracing Proceeds to Attorney's Pockets (and the Dilemma of Paying for Bankruptcy), 78 Minn.L.Rev. 1079 (1994). Numerous courts, including this one, have addressed this issue, yet a uniform and easily applied set of guiding principles has proved elusive. The conundrum which arises in this instance results from the allegedly

"advance payment" nature of the retainers in question. The relevant facts are deceptively straightforward.

The Debtors each operate a clinic for the treatment of individuals suffering various forms of eating disorders. Corestates is the Debtors' pre-petition lender and holds a first priority blanket lien against all of the Debtors' assets as security for the repayment of its loans. Testimony at the hearing on February 15, 1996, was offered from both principals of the Debtor corporations. This testimony established that in or about November 1995, the Debtor experienced cash flow shortages and was engaged in discussions with Corestates concerning a restructuring of its debt. The Debtors contend that they received verbal assurances from Corestates at the time that despite periodic cash shortfalls the Bank would forbear from dishonoring the Debtors' checks to various vendors, suppliers, etc. The Debtors further contend that in contravention of this alleged verbal promise Corestates thereafter began to "sweep" their operating accounts at the close of each business day, applying the proceeds from such sweep to the payment of Corestates debt service. The Debtors acknowledge that they, in turn, then secretly opened a checking account at a Beneficial Savings Bank branch in the State of Delaware, depositing therein approximately $600,000 between the date such accounts were opened and the date these bankruptcy cases were commenced. It is undisputed that in addition to the payment of various ordinary operating expenses, the monies deposited in the Beneficial Savings bank account were used to pay pre-petition retainers to the Debtors' bankruptcy counsel. The flow of funds in this respect for both Debtors is collectively detailed in a document introduced at the hearing of February 15, 1996 as Exhibit B–1, which provides:

RENFREW CENTER, INC. AND
RENFREW CENTER OF FLORIDA, INC.

I. PRE–PETITION

| | Amount received | Date | Corresponding bills |
|---|---|---|---|
| 1. | $ 5,000.00 | 10/31/95 | retainer |
| 2. | $50,000.00 | 12/8/95 | retainer |
| 3. | | | fees 10/1/95 thru 10/31/95—2,088.00 |
| 4. | | | fees 11/195 thru 11/30/95—$522.00 |

TOTAL FEES: $ 2,610.00

| | |
|---|---|
| RETAINER: | $55,000.00 |
| FEES: | − $2,610.00 |
| BALANCE: | $52,390.00 |

5.          fees and costs 12/1/95 thru 1/12/96—$15,856.44 (includes $800.00 filing fee per debtor)

| | |
|---|---|
| RETAINER: | $52,390.00 |
| FEES: | − $15,856.44 |
| BALANCE: | $37,073.56 |
| | ÷ 2 |

$18,536.78 (per debtor)

6. $15,000.00                 1/12/96     retainer

$18,536.78
+ $7,500.00

Retainer:                      $26,036.78 (per debtor)

Testimony on February 15, 1996 established several additional salient facts: 1) All of the receipts deposited in the Beneficial bank account were derived from the collection of accounts receivable which form part of Corestates' collateral; 2) at or about the time of their decision to commence bankruptcy cases the Debtors agreed to a request by bankruptcy counsel to furnish pre-petition retainers which would be in the nature of "advance payment" retainers, as opposed to security retainers, in order that the same might be insulated thereafter from any claim of the Bank; 3) the counsel applications filed by each Debtor herein disclose the intended advance payment nature of the pre-petition retainers and contain acknowledgments by the principals of the Debtors to such terms; and 4) upon receipt of the retainers, the same were deposited by bankruptcy counsel into the law firm's general operating account, as opposed to being segregated into the firm's trust or escrow account.

On the basis of the foregoing, the Debtors and their counsel contend that the retainer funds in question are free, at this juncture, from any lien claim of Corestates, although they agree that ultimate retention of the monies by counsel would be subject to the allowance of compensation after the filing of an appropriate fee petition. Corestates, on the other hand, characterizes the advance payment nature of the retainers as "mere semantics," and argues that these circumstances represent a scheme or a sham, contrived by persons whose inequitable conduct should not now be rewarded by the Court.

***Discussion.***

### A.  *The Disputed Retainers*

As previously noted, there is no shortage of case law and commentary on the subject of retainers. In this respect, numerous authorities have noted the existence of two broad categories of retainer agreements. The first is sometimes referred to as the classic retainer. In a classic (or general) retainer agreement a client agrees to pay a fixed sum in exchange for the attorneys promised availability to perform legal services that may arise during a specific period of time. An essential characteristic of the classic retainer is that it is earned entirely by the attorney upon payment, with the client retaining no interest in the funds thereafter. *In re McDonald Brothers Construction, Inc.*, 114 B.R. 989, 998–99 (Bankr. N.D.Ill.1990); *cf.*, *In re C & P Auto Transport Inc.*, 94 B.R. 682, 687 (Bankr.E.D.Cal. 1988), (recognizing that classic retainers under state law are "earned when paid."). The argument has been made that an attorney in receipt of a classic retainer payment, although obliged to disclose the same pursuant to 11 U.S.C. § 329, is free from the more demanding notice and hearing requirements for approval of said fee under 11 U.S.C. § 330. This argument has met with some disfavor in the courts. *See e.g., In re NBI, Inc.*, 129 B.R. 212 (Bankr.D.Colo.1991). (Earned retainers are unreasonable in a bankruptcy case because they impermissibly circumvent the explicit and implicit requirements of the Bankruptcy Code and Rules pertaining to compensation of professionals, particularly debtor's counsel.)

In contrast to the classic retainer is the special retainer, which itself comes in two varieties: a security retainer and an advance fee retainer. In the case of the security retainer, the attorney holds the same to secure payment of fees for future services. The funds do not constitute a present payment but instead remain the property of the Debtor until the attorney applies it to charges for services actually rendered, normally after the submission and approval of an application for compensation. In the advance fee retainer arrangement, the attorney receives payment in advance for contemplated legal services and depletes the prepaid fund as services are rendered. Advance fee retainers differ from security retainers in that *ownership* of the funds is intended to

pass to the attorney at the time of the payment.

■ Although the Debtors contend in the first instance that the retainers in question herein are advance payment retainers, their fall-back position, as expressed in post hearing memoranda of law, is that counsel's retention of the funds in question is justifiable even if the same are viewed as security retainers: that is; assuming, *arguendo,* the accuracy of Corestates assertion that the difference between the two types of retainer arrangements in this instance is mere semantics, the Debtors assert that the possessory lien of Debtors' counsel as to the funds in issue should still be viewed as superior to the lien of Corestates. In support the Debtors cite the March 16, 1994 Opinion and Order of this Court in the jointly administered Chapter 11 cases of *In re Baltic Associates, L.P.* (Bankruptcy No. 92–23872) and *In re Mediterranean Associates, L.P.* (Bankruptcy No. 92–23873), 1994 WL 791634 (Bankr.E.D.Pa. 1994). Corestates, in contrast, argues that the decisions reached by this Court in *In re Baltic* and *In re Mediterranean* were incorrect, and that the correct outcome in those cases, and this case, (which would dictate disgorgement of the funds in question) is that reached by Chief Bankruptcy Judge Scholl of this District in *In re Quaker Distributors, Inc.,* 189 B.R. 63 (Bankr.E.D.Pa.1995). As will hereinafter be discussed, the Court has concluded that the instant retainers pass muster as permissible advance payment arrangements and that counsel's retention of the funds in question will therefore be allowed. The frequency of security retainers arrangements in Chapter 11 cases, however, warrants the Court's also briefly addressing the security retainer issue.

In *Quaker Distributors,* Judge Scholl noted the applicability of 13 Pa.C.S.A. § 9306(d) to a priority dispute between bankruptcy counsel and a secured pre-petition lender. This section of the Uniform Commercial Code, as adopted in Pennsylvania, provides in pertinent part, as follows:

(d) Effect of insolvency proceedings.— In the event of insolvency proceeding instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in the following proceeds:

(1) in identifiable noncash proceeds and in separate deposit accounts containing only proceeds.

(2) in identifiable cash proceeds in the form of money which is neither commingled with other money nor deposited in a deposit account prior to the insolvency proceedings;

(3) in identifiable cash proceeds in the form of checks and the like which are not deposited in a deposit account prior to the insolvency proceedings; and

(4) in all call and deposit accounts of the debtor in which proceeds have been commingled with other funds, but the perfected security interest under this paragraph (d) is

(A) subject to any right of set-off; and

(B) limited to an amount not greater than the amount of any cash proceeds received by the debtor within ten days before the institution of the insolvency proceedings less the sum of (I) the payments to the secured party on account of cash proceeds received by the debtor during such period and (II) the cash proceeds received by the debtor during such period to which the secured party is entitled under paragraphs (1) through (3) of this subsection (d).

■ *Quaker Distributors* involved a fact pattern quite similar to that herein in that the pre-petition lender's security interest consisted of a blanket lien against its borrowers' assets, while the funds paid to counsel as a retainer consisted exclusively of the proceeds from the Borrowers' accounts receivable. In *Quaker Distributors,* unlike the instant case, the funds when transmitted to counsel were acknowledged to be in the nature of a security retainer and were accordingly segregated by counsel in an escrow account. On the basis of that key point, the defenses potentially available to the Debtor and counsel under 13 Pa.C.S.A. § 9306(d) were unavailable, and thus did not impede the Court's conclusion that the identifiable proceeds in the hands of counsel were subordinate to the Bank's prior perfected security interest. The Debtors note that the result in *Quaker Distributors* is at variance with the result reached by this Court in *In re Baltic*

*Associates* and *In re Mediterranean Associates.* The facts of the latter two Chapter 11 cases, however, differed slightly but importantly from *Quaker Distributors*. *Baltic* and *Mediterranean* were single asset realty cases wherein the security retainers paid to Bankruptcy counsel were derived from rentals of the properties. Prior to the reassignment of both bankruptcy cases to the undersigned in November of 1994, the rentals had been declared to be cash collateral of the Debtors' pre-petition lender Federal National Mortgage Association ("FNMA") pursuant to a rent assignment. In *Baltic* and *Mediterranean,* the Court noted that the question of the relative right of FNMA and Debtor's counsel to the retainer funds was complicated because the perfection of the FNMA lien was subject to applicable principles of non-bankruptcy real estate law, whereas the perfection of the lien of Debtors' counsel was subject to the provisions of the Uniform Commercial Code. The Court found no specific authority to help reconcile the question of the competing liens in that context. Against that backdrop, and for the reasons more fully discussed in *Baltic* and *Mediterranean,* the Court concluded that the possessory lien of counsel as to the retainers in question primed the pre-petition lien of the secured creditor. The Court does not see the results in *Baltic* and *Mediterranean* as incompatible with *Quaker Distributors* for the latter involved claimants both of whose liens were subject to the Uniform Commercial Code. Moreover, the results in *Baltic* and *Mediterranean* themselves might arguably have been different if the facts had been better developed. In *Baltic* and *Mediterranean* no evidentiary record was made by the parties such as might possibly have supported a claim for turnover of the security retainers paid to counsel on theories of conversion, fraudulent conveyance, or voidable preference. The same, of course, cannot be said of the instant matters. In view of the uncontested fact that the retainers paid to counsel in the instant case consisted exclusively of receipts from the collection of accounts receivable, this Court would not sustain their retention by Debtors' counsel to the extent, if any, that such payment is viewed as a security retainer. The reasoning in *Quaker Distributors,* with which this Court concurs, dictates that result. This conclusion, moreover, is not undercut by the fact that the funds in issue were apparently deposited by counsel into its general operating account. Other things being equal, such commingling of monies might make available the safe harbor provisions of 13 Pa.C.S.A. § 9306(d)(2). The nature of a security retainer, however, requires its deposit into a separate escrow account under both common law as well as the rules of professional conduct. Any disregard by counsel of those obligations, coupled with an assertion that the same then insulates the payment from disgorgement under applicable provisions of the Uniform Commercial Code, would be ill received by this Court, and would probably warrant the imposition of a constructive trust or invite some other equitable remedy.

Accordingly, to prevail in the instant dispute the Debtors and counsel must establish that the retainers in question are permissible advance payment retainers. In this respect, and notwithstanding the rather clear evidence of record on this point, there is more to the question than appears at first blush. The Court is satisfied that the parties took adequate tangible steps to establish, confirm and memorialize the retainer agreements between them as ones of advance payment. In particular, the Court notes specifically the disclosure of the same in the application on file with the Court, as well as the credible testimony of the principals of the Debtor. The Court notes, too, the Opinion of the Philadelphia Bar Association's Committee on Legal Ethics and Professional Responsibility (PA Opinion No. 95–100) wherein the validity of advance payment retainer agreements is upheld.[1] While these facts amply support the position of the Debtors and their counsel, it will hardly do to dismiss lightly the observation of Corestates that the intentional diversion of its collateral, with the acquiescence or tacit encouragement of bankruptcy counsel who stood to benefit therefrom, is not the

---

1. OPINION 95–100 (8/1/95) **Fees; Retainers; Retainer agreements.** In the absence of an agreement to the contrary, retainer payments are considered the property of the client until they are earned, and therefore must be deposited into the lawyer's client escrow account. The lawyer may make an agreement with the client that the lawyer will deposit the funds into the lawyer's

sort of conduct the Court should be quick to endorse. In this respect, however, one must recall that the Debtors' alleged justification for the establishment of a secret bank account was their belief that this presented the only means by which they might continue to pay ordinary operating expenses during the period when negotiations with Corestates were in the process of failing, a fact which ultimately led to their bankruptcy filings. The Debtors likewise again direct the Court to its own discussion in *Baltic* and *Mediterranean* where the Court opined that the payment of retainers to legal counsel by companies in financial difficulty can be and usually is a normal operating expense. While not prepared to move entirely off the latter position, the Court is constrained to take note that the matter is capable of being viewed differently. In the context of disputes under 13 Pa.C.S.A. § 9306(d), certain courts have indeed construed the ordinary course of business defense broadly, provided however that the transaction in question does not bear certain indicia of bad faith. *Harley–Davidson Motor Co. v. Bank of New England,* 897 F.2d 611, 622 (1st Cir.1990); *J.I. Case Credit Corp. v. First Nat'l Bank,* 991 F.2d 1272, 1279 (7th Cir.1993). As the authors of *Tracing Proceeds to Attorneys Pockets (And the Dilema of Paying for Bankruptcy)* note, such views are consistent with Official Comment 2(c) to the Uniform Commercial Code § 9306(d) which distinguish between individuals taking funds in the ordinary course of a debtor's business and recipients who have engaged in fraudulent, collusive, or otherwise unfair behavior. 78 Minn.L.Rev. at 1138. In this respect, the Court notes the obviously

fertile ground for tension between the philosophy of liberally interpreting a debtor's ordinary course of business affairs as a safeguard against disenfranchisement from bankruptcy protection of an entity whose assets are subject to a blanket lien, and the philosophy that secured parties should have the right to insist that borrowers and counsel refrain from fraudulent, collusive, or otherwise unfair behavior as a prelude to a bankruptcy filing. It is perhaps unrealistic to go beyond this general observation herein, for the inquiry and the outcome in any particular case is likely to be fact sensitive. The Court is satisfied that the instant Debtors' advance payment retainer arrangements with Bankruptcy counsel, while arguably suspect, are not so reflective of overreaching and impropriety as to warrant their disregard as either tortious or inequitable. In this respect, the Court notes that the retainers paid to bankruptcy counsel were but a small portion of the monies which flowed through the Delaware bank account, and that the retention in question otherwise satisfies the requirements for establishment of an advance payment fee agreement. The Court accepts as credible the testimony of the Debtors' officers that their actions, in their belief, were necessary in order to "keep the ship afloat" once Corestats commenced sweeping their operating accounts. While it certainly is not an excuse for conduct which was almost certainly in derogation of Corestates contractual rights, the testimony is an explanation which tends to portray the conduct as no more or less egregious than numerous acts which are taken by debtors in derogation of the rights of creditors shortly before a bankruptcy filing. Clearly, no at-

general operating account so long as any unearned portion of the funds is promptly returned to the client at the termination of services. This can only be established by a written agreement following the rule on fees or clearly stating that the funds will be deposited into the lawyer's general operating account. Where the funds are deposited into the lawyer's client escrow account, the lawyer may transfer funds as they are earned only under a written agreement that permits the transfer based on the value of the legal services. Non-refundable retainers, where a payment is made to a lawyer with the clear unambiguous agreement that the lawyer may retain the money regardless of whether legal services are performed, are not per se prohibited. Such agreements must be set forth in clear, unambiguous language in a written statement provided to the client or in a written agreement between lawyer and client. Fees are not to be excessive or illegal; the amount of a non-refundable retainer should not be so great to restrict a client's ability to discharge a lawyer at any time, with or without cause. If funds from a non-refundable retainer are deemed to be earned upon payment, then the lawyer may deposit them into the lawyer's general operating account; however, the intention to so deposit them should be memorialized in a clear and unambiguous written statement. Where a retainer is denominated as a minimum fee it should be treated as a refundable retainer. If the minimum fee is non-refundable it should be treated as a non-refundable retainer. Opinions 85–120, 93–180; Philadelphia Bar Opinion 86–128; Rules 1.5(b), 1.15, 16(a)(3).

tempt to endorse or otherwise approve of such conduct is made herein. The Court merely holds that in cases of an otherwise permissible advance payment retainer, the circumstances herein are not such as to persuade the Court to negate the instant fee arrangements. The Court stresses however that this was a fairly close call and that the conclusions herein should be construed restrictively.

### B. Conflict of Interest

 The objection or comment of the United States Trustee concerning a possible conflict of interest on the part of proposed counsel, like the retainer issue, has an obvious degree of appeal. Apart from the visceral tendency one has to question whether an attorney can adequately serve two masters, there is a "red flag" in this case due to the presence of a large inter-company claim between the two affiliated Chapter 11 debtors. The Third Circuit Court of Appeals has spoken on this issue, however, in *In re B H & P, Inc.*, 949 F.2d 1300 (3d Cir.1991) ("BH & P"), and has rejected a *per se* disqualification standard in such circumstances. The Circuit Court instead has endorsed an objective approach which requires the Court's consideration of factors such as whether there has been complete disclosure of the potential conflict, whether the interest of the related estates are parallel or conflicting and the nature of the inter debtor claims made. *Id.* at 1316.

The Court has evaluated the proposed dual representation of the instant debtors by the foregoing criteria and is satisfied that no impermissible conflict of interest has been demonstrated at this time. In this respect, the Court notes specifically 1) that the inter-company claim and the potential for conflict of interest has been adequately disclosed; 2) that the inter-company claim is liquidated and undisputed; 3) that the equity interest of the Chapter 11 debtors for the most part are closely held by the same small group of individuals and 4) that there are separate creditors committees, represented by separate counsel functioning in the two cases. The foregoing, in the Court's view, provides ample and sufficient assurance against any risk that Debtor's counsel can act to favor one estate over the other in the prosecution

of the cases or the formulation and consummation of plans of reorganization. That so, and without further evidence that an actual conflict exists, the Court is disinclined to burden the Debtors and their creditors with the added expense which separate representation of each Debtor would inevitably entail.