**In re INSILCO TECHNOLOGIES, INC., et al., Debtors.**

**No. 02–13672 (KJC).**

United States Bankruptcy Court, D. Delaware.

April 18, 2003.

Pauline K. Morgan, James L. Patton,
Young, Conaway, Stargatt & Taylor, Wilmington, DE; George Wade, Constance
Fratianni, Scott Shelley, Shearman &

Sterling, New York City; Jack R. Pigman, Porter, Wright, Morris & Arthur LLP, Columbus, OH, for Debtor.

Mark Minuti, Saul, Ewing, LLP, Wilmington, DE, for Helima Rollform, LLC.

John H. Knight, Richards, Layton & Finger, PA, Wilmington, DE, for The Lender Group.

William Kelleher, Ballard, Spahr, Andrews & Ingersoll, LLP, Wilmington, DE, for Wachovia Bank.

Warren T. Pratt, Drinker, Biddle & Reath, LLP, Philadelphia, PA; Andrew I. Silfen, Arent, Fox, Kintner Plotkin & Kahn, PLLC, New York City, for Creditor's Committee.

David L. Buchbinder, Dept. of Justice, Wilmington, DE, for U.S. Trustee.

### MEMORANDUM OPINION[1]

KEVIN J. CAREY, Bankruptcy Judge.

On December 16, 2002, the Debtors commenced these cases by filing voluntary petitions under chapter 11 of the Bankruptcy Code.[2] The Debtors filed various applications seeking to retain counsel and other professionals pursuant to sections 327 and 328 of the Code, to represent and/or advise the Debtors in these cases.[3] On January 7, 2003, the United States Trustee filed a limited objection to the applications of five of the Debtors' professionals. A combined evidentiary hearing was held on March 24, 2003. For the reasons set forth below, to the extent the relief requested has not already been ordered, the Debtors' retention applications will be granted.

### FACTUAL BACKGROUND

The Debtors describe themselves as follows:[4] The Debtors and their non-debtor affiliates (collectively, the "Company") are leading global manufacturers and developers of highly-specialized electronic interconnection components and systems, serving the telecommunications, computer networking, electronics, automotive and medical markets. They offer a broad range of magnetic interface prod-

1. This Memorandum Opinion constitutes the findings of fact and conclusions of law required by Fed. R. Bankr.P. 7052, made applicable to contested matters by Fed. R. Bankr.P. 9014. The Court has jurisdiction over these matters pursuant to 28 U.S.C. § 1334, § 157(a). These are core proceedings pursuant to 28 U.S.C. § 157(b)(1) and (b)(2)(A).

2. All statutory references herein are to the Bankruptcy Code, 11 U.S.C. § 101 et seq., unless otherwise noted.

3. The other debtors in these jointly administered chapter 11 proceedings are Insilco Holding Co., InNet Technologies, Inc., Insilco International Holdings, Inc., Precision Cable Mfg. Corporation, Eyelets for Industry, Inc., EFI Metal Forming, Inc., Stewart Stamping Corporation, Stewart Connector Systems, Inc., Signal Caribe, Inc., and Signal Transformer Co., Inc.

4. The following description is condensed, but taken almost verbatim from the background contained in the various applications.

ucts, cable assemblies, wire harnesses, fiber optic assemblies and subassemblies, high-speed data transmission connectors, power transformers and planar magnetic products, and highly engineered, precision-stamped metal components.

The Debtors' operations are organized into three business segments: Custom Assemblies, Passive Components and Precision Stampings. The Custom Assemblies segment produces custom wire, cable and electro mechanical assemblies used by manufacturers in the telecommunications, data processing and other industries. Passive Components offers high-speed data network connectors, integrated magnetic components and power transformers for producers in computer networking, telecommunications, electronics and security systems markets. Precision Stampings offers precision metal stampings and wire formed parts used in a broad range of industries, including the electronics, electrical and automotive markets.

The Company maintains more than 1.5 million square feet of active manufacturing space in 20 locations throughout the United States, Canada, Mexico, China, Ireland and the Dominican Republic. For the fiscal year ended December 31, 2001, the Company had revenue of approximately $246.1 million. For the nine month period ended September 30, 2002, the Company had revenue of approximately $147.3 million.[5] As of the date these cases were filed, the Company had approximately 4,450 employees throughout the United States and abroad.

Due to the continuing depressed state of the telecommunications industry, many of the Debtors' primary customers significantly reduced the volume of products purchased from the Debtors and the Debtors' revenues have failed to reach previous levels. As a result of their diminished cash flow, the Debtors do not presently have the ability to service their significant long-term debt obligations in the ordinary course of business. After examining numerous restructuring alternatives with their investment advisors and consulting with their senior secured lenders, the Debtors determined that a chapter 11 filing presented the best alternative to maximize the value of their estates for the benefit of creditors. With the filing of these cases, the Debtors also filed motions seeking approval of bidding procedures for sales of substantially all of the Debtors' assets on a going concern basis and authorization to consummate such sales. Various pre-confirmation sales have already been approved [Doc. Nos. 439, 440, 442, 443, 445, 507], setting the stage, ultimately, for the proposal of a consensual chapter 11 plan of liquidation. (Tr. at pp. 52–53).[6]

To assist with the tasks attendant to these cases, the Debtors seek to retain several professionals pursuant to §§ 327 and 328. On December 19, 2002, the Debtors filed applications to retain the following professionals: (1) Young, Conaway, Stargatt & Taylor LLP, as Delaware bankruptcy counsel [Doc. No. 44]; (2) Shearman & Sterling, as bankruptcy co-counsel [Doc. No. 43]; (3) Porter, Wright, Morris & Arthur LLP, as special counsel for employment, employee benefits, executive compensation and other related matters [Doc. No. 40]; (4) Benetar Bernstein Schair & Stein, as special counsel for labor law and related matters [Doc. No. 41]; and (5) Gleacher Partners LLC, as financial advisors [Doc. No. 38].

---

5. The Debtors' Summary of Schedules reflect, in the aggregate, businesses with assets of $345,966.211 and liabilities of $4,174,476,668.

6. References are to the March 24, 2003 hearing transcript.

On January 7, 2002, the United States Trustee ("UST") filed a limited objection to the terms of the proposed retention of the five Debtors' professionals listed above [Doc. No. 84]. Specifically, the UST objects to the extent the professionals seek authority from the Court to hold their retainers completely intact until the end of the case. This type of retainer is commonly referred to as an "evergreen retainer."

The respective applications disclose that the following retainers are being held:

| Professional | Retainer Amount |
| --- | --- |
| Gleacher Partners | $250,000. |
| Young Conaway | $200,000. |
| Shearman & Sterling | $750,000. |
| Benetar Bernstein | $ 25,000. |
| Porter Wright | $ 80,000. |

The retention of Young Conaway, Shearman & Sterling and Gleacher were approved by Orders dated January 9, 2003 [Doc. Nos. 105, 106, 107], subject to a reservation on the issue of the propriety of the proposed evergreen retainers. Thereafter, the retention of Benetar Bernstein and Porter Wright [Doc. Nos. 151, 152] were approved by Orders dated January 21, 2003, also subject to the same reservation.

### DISCUSSION

There are essentially two general categories of retainers: "classic" and "special" retainers. *In re Pannebaker Custom Cabinet Corp.*, 198 B.R. 453, 459 (Bankr. M.D.Pa.1996). The classic retainer is when "a client agrees to pay a fixed sum in exchange for the attorney's promised availability to perform legal services that may arise during a specific period of time." *Id., quoting In re Renfrew Center of Florida, Inc.*, 195 B.R. 335, 338 (Bankr.E.D.Pa. 1996).

The special retainer is divided into two categories: a security retainer and an advanced fee retainer. *Pannebaker*, 198 B.R. at 459. The security retainer allows the attorney to hold the retainer to secure payment of fees for future services. *Id.* The funds in a security retainer "do not constitute a present payment but instead remain the property of the debtor until the attorney applies it to charges for services actually rendered, normally after the submission and approval of an application for compensation." *Id., quoting Renfrew*, 195 B.R. at 338. An advance fee retainer is similar to the security retainer, except that ownership passes at the time of payment to the attorney. *Id.*

The evergreen retainer is similar to a security retainer in that it is to secure payment of fees for future services. But in the case of an evergreen retainer, the funds are not intended to be used to pay approved fees until approval of the final fee application. Instead, the holder of an evergreen retainer intends to be paid its interim fees and expenses out of operating cash. Such a position is designed to minimize a professional's risk of non-payment if a debtor's financial position deteriorates, an estate becomes illiquid and does not have sufficient cash flow to pay professional fees.

So far as I am able to determine, whether professionals retained under §§ 327, 328, and 329 should be permitted an evergreen retainer is one of first impression in this district and in this circuit. The UST argues that evergreen retainers should not be allowed, since there is no basis for treating the professionals differently from other administrative creditors. The UST further asserts that the professionals in these chapter 11 cases already have the protections of a $1,800,000 "carve-out" provided by the lenders in the cash collateral

order [Doc. No. 154, ¶ 11], as well as an administrative order in place, allowing for interim compensation and reimbursement of expenses [Doc. No. 111]. The UST, accurately, calls the "carve-out" and the benefits of the administrative order "risk minimizing devices." [7]

The Debtors assert that the evergreen retainers are permissible and rely on the Third Circuit's market-driven approach to professional employment and compensation issues to support their requests. The crux of the Debtors' argument is that because evergreen retainers are common in the market for such professional services, it follows that professionals should be allowed to hold retainers throughout the administration of a chapter 11 case.

While the parties have cited some decisional law in support of their respective positions, most notably, *In re Benjamin's–Arnolds, Inc.*, 123 B.R. 839 (Bankr. D.Minn.1990), there is relatively little decisional law directly on point to guide determination of the subject before me.

In an attempt to articulate a framework to be employed in determining whether, in any given situation, an evergreen retainer should be allowed, I look first to established law, then will enumerate various factors which are relevant to the application of that law.

The standards governing the retention and compensation of professionals in the administration of a chapter 11 case are provided by §§ 327, 328, 329 and 330, as well as Fed. R. Bankr.P. 2016(b) and 2017(a). Section 328 authorizes the employment of professional persons "on any *reasonable* terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis." Section 328 applies to all professionals, including financial advisors, that a debtor seeks to retain. Similarly, the applicable standard for attorneys who received prepetition payment is set forth in § 329(b). Section 329(b) provides that if prepetition compensation exceeds the *reasonable* value of any services provided then the Court may cancel the agreement or order the return of payment. Thus, it is clear that the Court is guided by a standard of reasonableness when analyzing the terms and conditions of engagement of professionals, including retainers held by professionals.

To determine what is reasonable, the Court of Appeals for this Circuit has framed the initial point of inquiry:

... [W]e have recognized that § 330, which deals with what constitutes "rea-

---

7. I take judicial notice of the cash collateral and administrative orders. "Federal Rule of Evidence 201 authorizes a court to take judicial notice of an adjudicative fact 'not subject to reasonable dispute'... [and] so long as it is not unfair to a party to do so and does not undermine the trial court's fact finding authority." *In re Indian Palms Assoc.*, 61 F.3d 197, 205 (3d Cir.1995).

Under the terms of the cash collateral order, the lenders have agreed that should insufficient unencumbered assets be unavailable for the payment of their approved fees, such professional may look to the lenders' collateral for payment, subject to a $1.8 million cap.

Under the terms of the "administrative order" entered in this case, non-ordinary course professionals are permitted, upon submission of the appropriate monthly application, and without awaiting court approval, to seek payment from the Debtor of 80% of their fees and 100% of costs incurred during that month. Any request for payment is subject to objection by any interested party and periodic review by the court via quarterly and final application by the professionals. The administrative order, therefore, by allowing monthly payments to professionals, alleviates the problems caused, particularly in the so-called "mega cases," by having to await court approval of quarterly fee requests, while accruing substantial time and costs in prosecuting the chapter 11 proceeding.

sonable" compensation for professionals, takes a "market-driven" approach. *In re Busy Beaver Building Centers, Inc.,* 19 F.3d 833, 852 (3d Cir. 1994)....[S]ome reference to the market is not out of place when considering whether terms of retention are "reasonable" in the bankruptcy context.

*United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.),* 315 F.3d 217, 229 (3d Cir.2003).

The applicants assert, and the UST does not dispute, that the taking of evergreen retainers is a practice now common in the marketplace [Doc. No. 539, Tr. at p. 11].

However, the Court of Appeals has also instructed that, while the bankruptcy court's view should be "market-driven," it is not to be "market determined." *United Artists,* 315 F.3d at 230 (That practices "are now common in the marketplace does not automatically make them 'reasonable' under § 328.") *Id. See also, e.g., Zolfo, Cooper & Co. v. Sunbeam–Oster Co. (In re Sunbeam–Oster Co.),* 50 F.3d 253 (3d Cir. 1995) and *Calpine v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.),* 181 F.3d 527 (3d Cir.1999), which looked in the first instance to various market prices or practices, but acknowledged that market prices and practices are still subject to review by the bankruptcy court for application in the bankruptcy context. In "the realm of bankruptcy ... courts play a special supervisory role." *United Artists,* 315 F.3d at 230.

Therefore, the court's further inquiry about what is "reasonable" must be tailored to Bankruptcy Code requirements, including the particular circumstances of a chapter 11 proceeding, the court's supervisory role and the interests of the various constituents. Factors to be considered, include, but are not necessarily limited to (1) whether terms of an engagement agreement reflect normal business terms in the marketplace; (2) the relationship between the Debtor and the professionals, i.e., whether the parties involved are sophisticated business entities with equal bargaining power who engaged in an arms-length negotiation; (3) whether the retention, as proposed, is in the best interests of the estate; (4) whether there is creditor opposition to the retention and retainer provisions; and (5) whether, given the size, circumstances and posture of the case, the amount of the retainer is itself reasonable, including whether the retainer provides the appropriate level of "risk minimization," especially in light of the existence of any other "risk-minimizing" devices, such as an administrative order and/or a carve-out.[8] This list is not intended to be exhaustive, nor will every factor necessarily be of equal weight, depending upon the circumstances. Moreover, even if the terms of an engagement are approved, § 328 provides that the court retains discretion to modify the retention "if such terms and conditions prove to have been improvident."

The record made here demonstrates that the applicants are entitled to retention, the terms of which include evergreen retainers.

First, it is not disputed that the taking of evergreen retainers is a practice now common in the market place. The testimony also supports the conclusion that the practice in this district has been engaged in since at least the early 1990's (Tr. at p. 24).

---

**8.** *Cf. United Artists,* 315 F.3d 217, 238 n. 4. (Judge Rendell concurred with the result reached by the majority and discussed various factors which courts have considered in determining "reasonableness" under § 328).

Second, neither did the UST dispute that the Debtors and the respective applicants are sophisticated business entities with equal bargaining power, who engaged in arms-length negotiations for the retention terms.

Third, approval of the retention arrangements reached by the Debtors and the respective applicants, enables the Debtors to maintain the relationships established pre-petition with their professionals. In this particular case, this is of great advantage to the estate, since the same professionals who assisted the Debtors in preparation for the conduct of these cases, substantially in advance of the filings, continue to render services. This is especially helpful when the parties planned the going concern sales well in advance of the chapter 11 filings, and which sales required immediate judicial consideration after the filings. *See* March 20, 2003 Declaration of Constance Fratianni (Ex. D–1).

Fourth, there is no creditor opposition to the terms of the proposed retentions. The only objecting party is the UST. The parties whose economic interests are directly at stake, and, arguably, might be most adversely affected by the proposed terms of retention are (1) the lenders, whose lien interests have been subordinated by agreement (by virtue of the cash collateral order) to permit payment of the retainers at issue, *see also* Tr. at pp. 43–47, and (2) the unsecured creditors.[9] Neither has objected. Counsel for the Official Committee of Unsecured Creditors argues that failure to approve the proposed retentions "will have serious consequences on the Unsecured Creditors and the process that we've all tee'd up here to get us through the case." (Tr. at p. 42).

Fifth, each case must be decided upon its circumstances. Here, the Debtors' liabilities far outweigh their assets. The Debtors' funding is dependent entirely upon their and the Committee's ability to negotiate its continued funding with the lenders and, at least at the beginning of the case, it was far from certain that confirmation of a plan would be the outcome. Therefore, the existence here of other "risk minimizing" devices, i.e., the carve-out and the administrative order, should not preclude the approval of evergreen retainers. The risks attendant in this venture are evident, especially since a consensual plan has yet to be filed. (Tr. at pp. 41–42).

While not raised in her written objection, at the evidentiary hearing, the UST argued strenuously that the requests for approval of the proposed evergreen retainers should be denied for failure of the applicants to have disclosed to the Court that such retainers were intended to be "evergreen" and for failure to have given notice thereof to the creditors.[10]

Although having been put to the task of inquiring about the nature of the retainers,

9. The UST certainly has standing to raise her objection. 11 U.S.C. § 307; *U.S. Trustee v. Price Waterhouse (In re Sharon Steel Corp.)*, 19 F.3d 138, 140 (3d Cir.1994). *See also United Artists*, 315 F.3d at 225, citing *In re Columbia Gas Sys., Inc.*, 33 F.3d 294 (3d Cir.1994) ("A lack of pecuniary interest in the outcome of a proceeding does not deny the U.S. Trustee standing.... U.S. Trustees are officers of the Department of Justice who protect the public interest by monitoring certain aspects of bankruptcy proceedings ...").

10. During cross examination of one of the Debtors' witnesses, James L. Patton, there was testimony that applications do not always state that a retainer is held as security. Tr. at p. 39. Young Conaway is the only professional that stated in its application that after the retainer has been applied to outstanding pre-petition balances, the remaining unused portion of the retainer will be held as security for post-petition services and expenses [Young Conaway Application, ¶ 16].

the UST was also put on notice sufficient to lodge an objection. It is not disputed that the parties who were entitled to notice under Del. Bankr.L.R. 2014–1(b) and 2002–1(b) were given notice of these applications, some of whom were present at the evidentiary hearing. None objected to the evergreen retainers or supported the UST in her objection. I will not, therefore, deny the relief requested due to lack of disclosure or inadequacy of notice.

 Nonetheless, the UST's position illustrates that there is a need for greater clarity in engagements the terms of which are intended to include evergreen retainers. There is also room for improvement in how disclosure of such a term can be made in an application for employment. Henceforth, if the terms of a proposed engagement include a provision for an evergreen retainer, such term should be highlighted and summarized in the application; moreover, a copy of the engagement agreement should be attached as an exhibit to the application containing language which makes it clear that the applicant intends to hold such retainer until the end of the case (or until such other time as the parties have agreed).

### CONCLUSION

For the foregoing reasons, and based upon the standard set forth above, the applicants have demonstrated their entitlement to retention under terms which include "evergreen" retainers. An appropriate Order follows.

### ORDER

**AND NOW,** this 18th day of April, 2003, the previously ordered retention of Young, Conaway Stargatt & Taylor LLP [Doc. No. 106]; Shearman & Sterling [Doc. No. 105]; Gleacher Partners LLC [Doc. No. 107]; Benetar Bernstein Schair & Stein [Doc. No. 151]; and Porter, Wright, Morris & Arthur LLP [Doc. No. 152] having been subject to the Court's determination of the propriety of these professionals' retentions with "evergreen retainers," and for the reasons given in the accompanying Memorandum Opinion, it is hereby

**ORDERED AND DECREED** that approval of such applications shall include terms related to the applicants' respective retainer payments.