**In re FITZSIMMONS TRUCKING, INC., Debtor.**

**Bankruptcy No. 3–91–181.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Feb. 19, 1991.

William I. Kampf, Fredrikson & Byron, P.A., Minneapolis, Minn., for debtor.

Andrew J. Schmid, Office of U.S. Trustee, Minneapolis, Minn., for U.S. Trustee.

## ORDER RE: DEBTOR'S APPLICATION FOR APPROVAL OF EMPLOYMENT OF CHAPTER 11 COUNSEL

GREGORY F. KISHEL, Bankruptcy Judge.

This Chapter 11 case came on before the Court on February 5, 1991, for hearing on Debtor's application for approval of its employment of counsel. William I. Kampf appeared on the application. The U.S. Trustee appeared by his attorney, Andrew J. Schmid. Upon the application and its supporting documents, the U.S. Trustee's letter-response thereto, the record made at hearing, and the other files, records, and proceedings in this case, the Court makes the following order.

Debtor is a regional trucking concern which filed a voluntary petition under Chapter 11 on January 11, 1991. Fredrikson & Byron, P.A. ("Fredrikson") was its counsel of record for the filing. Immediately after the filing, Debtor submitted an application for approval of its employment of Fredrikson to the Office of the U.S. Trustee, pursuant to LOC.R.BANKR.P. (D.Minn.) 122(h).

On January 23, 1991, counsel for the U.S. Trustee forwarded the application to the Court, and declined to recommend approval of the employment due to the terms and conditions disclosed in the application. The U.S. Trustee's objection raises several points, four of which the Court took under advisement at the close of the hearing.

## I. "EVERGREEN" RETAINER

As part of its application, "Debtor proposes that the initial retainer paid to Fredrikson be held as security for future services rendered, and that current and future fees be paid from operating capital."

The proposal is to create an "evergreen" retainer, which counsel would hold in escrow until confirmation of a plan or conversion/dismissal of this case, while calling on Debtor's current revenues to satisfy interim fee allowances. To justify the proposal, Fredrikson maintains that it would have required a retainer of $50,000.00 for this case, given its size, relative complexity, and the attendant risks; however, Debtor's cash-poor status prevented it from advancing any more than $25,000.00, with jeopardizing its current operations. The firm determined that a "reasonable credit risk" for the extension of services would entail the maintenance of the $25,000.00 retainer as "evergreen," and a substantial increase in the frequency of fee applications over that otherwise dictated by the Bankruptcy Code.[1] Apparently, it did so after its attorneys had decided this case was worth taking on its merits.

As the U.S. Trustee notes, a standard practice for the treatment of attorney retainers and compensation in bankruptcy reorganization cases has prevailed in this District since the adoption of the Code in 1979. That practice has involved the client's posting of a pre-petition retainer, usually—as here—in an amount of some substance; counsel's retention of the retainer in trust until court allowance of compensation; application of the retainer to satisfy such allowances, until the retainer is exhausted; and satisfaction of further allowances from the debtor-client's current revenues.

This practice embodies a balancing of rights among the various constituencies which have claims against the debtor's post-petition cash and revenues. *See In re Cal–Inland, Inc.*, 124 B.R. 551, 553–554 (Bankr.D.Minn.1991). The law firm undertakes representation upon retainer terms which are within the debtor's current ability to meet. The firm does so—or only should do so—after evaluating the debtor's ultimate prospects of reorganization. Attorney fees, of course, are an administrative expense which the debtor must meet to

obtain confirmation of its plan. Thus, the evaluation must include an assessment of the likelihood that counsel will actually receive full compensation later in the case, or after it; though the theoretical goal of an attorney retainer is the posting of security for the full amount of anticipated fees, the inherent and near-universal condition of clients seeking Chapter 11 relief makes them unable to do this. The decision to take on the representation, then, is responsibly made only after counsel has concluded that the debtor has enough chance of reorganization to make it worth the necessary risk of recovering fees from the pre-petition retainer, and then from post-petition cashflow after the retainer is exhausted.

The reason why this treatment should be preferred is that a debtor in Chapter 11 needs all the control over post-petition revenues that it can get. Reorganizing businesses have to negotiate and make adequate protection payments to secured creditors; to satisfy skittish employees by maintaining payroll, benefits, and working conditions; to keep taxing authorities satisfied, by avoiding accrual of post-petition liabilities; and, usually, to meet current trade expenses on a cash-payment basis. These cash needs remain constant throughout the case, and are critical to its success. Locking substantial funds into escrow for the benefit of counsel for any period of time more than the first months of the case deprives the debtor of that much more flexibility in meeting these needs, and particularly in meeting the "emergency" or "unanticipated" costs that crop up in Chapter 11 cases with distressing frequency. It also erodes an inherent incentive for counsel to be hard-headed in sizing up the prospects of the case, several months into it. If the debtor's fortunes are foundering to the extent where it cannot pay at least a portion of interim fees from post-petition revenues, even while temporarily sheltered from many debt-service requirements, this says something about the prognosis of the

---

1. The latter aspect of Fredrikson's conclusions is treated in Section IV of this order, pp. 561– 562 *infra.*

reorganization effort. Attorneys who have the cushion of an evergreen retainer may not be as ready to counsel their client frankly and firmly about the fairness and propriety of continuing in the reorganization mode, because they will not be subject to the same continuing risks as creditors, taxing authorities, and equity holders until the retainer is consumed. The risk that creditors' interests will be hurt during a post-petition decline is thus markedly increased.

The "evergreen" retainer, then, is inadvisable because it upsets the balance among competing interests which underlies the standard local practice. Fredrikson argues, cogently if unsuccessfully, that if "evergreen" retainers are not allowed, "less risk-aversive law firms will end up taking these cases." This cannot be gainsaid—but in itself it says nothing about the results for quality of representation, or for the likelihood of successful reorganization in the cases. The relationship between "risk-aversiveness" as a matter of a law firm's business policy, and the quality of a firm's advocacy, is uncertain, and possibly unknowable. All law firms have to balance their desire to take on particular cases and particular practice specialties against the risk of non-payment of fees, taking into consideration the attractive and nonattractive circumstances of those cases and those areas of practice. Over the broad course of experience, the economics of the market will adjust the results, and will ameliorate negative consequences. "Less risk-aversive law firms" which do not give quality representation will not attract clientele, and will have less luck with the courts in allowance of compensation; firms which are willing to assume a reasonable degree of risk, and which put forth real effort in their representation, will see successful results over the long run.

Law firms will have to make their elections to be involved in this area of practice, assuming the prevalence of the standard retainer practice. Those cases which are evaluated by successive law firms, and are deemed "too risky" by counsel unwilling to put in uncompensated effort, will just not go into Chapter 11—or, to the extent they do so under representation by ineffective counsel, they will fail quickly. The ultimate point, however, is that past practice is—and should be—the bedrock of counsel's economic considerations. It should not be considered an impediment to be evaded on a case-by-case basis.[2]

■ Even if the argument in favor of "evergreen" retainers had carried the day, however, this would not be a proper case for one under the only articulated standard known to the Court. Counsel and accountants for a Chapter 11 debtor were allowed to carry such retainers in *In re Benjamin's–Arnold's, Inc.*, 123 B.R. 839. *See* Memorandum Order (Bankr.D.Minn. 1990) (Dreher, J.). In allowing the retainer, however, Judge Dreher specifically relied on certain factors presented by the case and the debtor's prospectus for it:

1. The debtor's financial problems largely stemmed from several unfavorable premises leases, and the debtor proposed to use 11 U.S.C. § 365 to deal with them promptly;

2. The debtor intended to propose a plan within the exclusivity period;

3. As a result, the "initial prospects for swift confirmation of a plan of reorganization were … favorable."

*In re Benjamin's–Arnold's, Inc., supra,* 123 B.R. at 840. In addition, as a monitoring procedure, Judge Dreher required the professionals to apply for allowance of compensation at strict 120–day intervals, and provided for review of the continuing carryover of the retainers at each fee appli-

---

**2.** The proponents also abjure that the hourly rate charged by lawyers is, in part, a function of the risk of non-payment in those lawyers' practice in general, and that hourly rates will rise as perceived risk rises. This, too, is undeniable. The market speaks, however, and ultimately will regulate the situation. (At least from the perspective of one not currently employed by a large law firm, it is difficult to see how *some* degree of risk of nonpayment is not already incorporated into hourly rates for attorneys of $110.00 to $210.00, and for legal assistants of $80.00, which Fredrikson has charged and been allowed recently in several other cases before this Court.)

cation. *In re Benjamin's–Arnold's, Inc.,* 123 B.R. at 842.

Obviously, Judge Dreher concluded that the cash resources of the debtor before her were ample, and the anticipated pendency of the case short. The same circumstances are not present here. As the U.S. Trustee points out, Debtor's resources have been stretched to the limit. Trucking businesses are cash-intensive, and require substantial operating capital and liquidity to meet the high on-the-road expenses of drivers. Debtor's operation is no exception. Hoping to wean itself from its prior arrangement for collection of receivables, it entered into a fairly complicated temporary arrangement with its factor, and prevailed on the Court to approve this on an expedited basis. Then, in less than three weeks it discovered that it could not efficiently switch from factor collection to self-collection in the time that its financial condition required; so, it did an abrupt *volte-face* and received court approval to resume its old factoring contract.

Beyond this, Debtor has had to grant post-petition liens against previously-unsecured assets to obtain revolving credit for payment of drivers' expenses. It has liquidated one "hard" asset—an unused parcel of real estate—to obtain cash for operations, and it has filed a motion for approval of sale of several units of rolling stock to raise more. Though Debtor's counsel has voiced an intention to take his client out of Chapter 11 by this fall, its past cash-deficient condition and numerous actual or potential conflicts over its complex secured debt structure do not make this a certainty.

Simply stated, Debtor needs access to every penny it can obtain, or it may not be able to reorganize. Even under the *Benjamin's–Arnold's* rationale, then, locking $25,000.00 of property of this estate into a form with very limited access simply is not warranted.

## II. IMPRESSMENT OF LIEN TO RETAINER

The same language of the retention proposal raises another question. As the U.S. Trustee notes, the ultimate import of its reference to "security" is unclear. It may do no more than purport to create an "evergreen" retainer, with the word "security" to be read in a non-technical sense. If the language has any significance beyond that, however, it must be read as a grant to Fredrikson of a lien against the escrowed retainer, to secure Fredrikson's current and future claims for compensation and expenses as they accrue.

■ The impressment of a lien against an attorney retainer in a Chapter 11 case is wholly impermissible. Until actually applied in satisfaction of an allowed claim for interim or final compensation, an attorney's retainer held in trust is property of the bankruptcy estate. 11 U.S.C. § 541(d); *In re Kinderhaus Corp.,* 58 B.R. 94, 97 (Bankr.D.Minn.1986). As property of the bankruptcy estate, it even remains available for release and application to other administrative-expense claims—albeit only upon court direction after appropriate motion, and only in extraordinary circumstances. *In re Ahlers,* 794 F.2d 388, 393–94 n. 2 (8th Cir.1986), *rev'd in part on other grounds,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). The terms of the trust relationship between counsel and its debtor-client limit the availability of the retainer to purposes other than satisfaction of counsel's claims. *In re Kinderhaus Corp.,* 58 B.R. at 97. They are, however, the only such limitation.

■ In Minnesota, the common-law "retaining lien" of an attorney against the money or property of a client in the attorney's possession was abolished by the legislature in 1976. 1976 Minn.Sess.L., c. 304, § 2; *Boline v. Doty,* 345 N.W.2d 285, 288 (Minn.App.1984). The attorney's "charging lien" against causes of action, judgments, and real estate, as governed by MINN. STAT. § 481.13, is still viable. *Id.* However, it has no applicability to these facts. Finally, under Minnesota law the attorney for a trustee cannot assert a lien against the *res* of the trust. *Truesdale v. Phila. Trust, Safe Deposit & Ins. Co.,* 63 Minn. 49, 52, 65 N.W. 133 (1895).

Fredrikson, thus, does not have a lien against its retainer by operation of law; to the extent that Debtor and Fredrikson intended the quoted language to create one, the provision confers a benefit upon Fredrikson which does not otherwise exist. This benefit, however, would have unfortunate circumstances; by conferring the status of lienor upon Fredrikson, it would both disqualify Fredrikson from serving as Debtor's counsel, and would support a disallowance of compensation to Fredrikson. *In re Pierce*, 809 F.2d 1356, 1362–63 (8th Cir.1987), *aff'g* 53 B.R. 825, 828–29 (Bankr. D.Minn.1985). As an express term of the initial retention, then, this provision neither should nor could be approved.

## III. DIRECT PAYMENT BY DEBTOR OF COSTS AND EXPENSES

■ As a further term of the retention, Debtor and Fredrikson propose to allow Debtor to directly pay "costs payable to third-party providers, such as travel expenses, transcripts of depositions ..., outside printing and postage expenses, and similar expenses," to the extent that Fredrikson does not pay those expenses. Presumably, the parties are to be allowed to assign the responsibility for payment of costs between themselves, on a discretionary basis. The U.S. Trustee correctly notes that this proposed procedure would undermine the process of review before allowance and reimbursement, which process is mandated by 11 U.S.C. § 330(a)(2). *See, e.g., In re Park Ave. Partners Ltd. Partnership*, 95 B.R. 605, 617 (Bankr.E.D. Wis.1988) (application, notice, opportunity for review by U.S. Trustee and parties in interest, and court approval are all necessary before Chapter 11 debtor is authorized to pay professionals' compensation and to reimburse them for their expenses). In addition, it would lay the groundwork for a difficult and painful inquiry, reallocation,

and adjustment, were the Court to determine that certain previously-paid expenses were not necessary to the reorganization effort. Again, then, this term of the retention will not be approved.

## IV. INCREASED FREQUENCY OF INTERIM APPLICATION FOR ALLOWANCE OF COMPENSATION

■ The source of the final point in contention is the following statement in Debtor's application:

A condition of retention is that the Court's Order of retention will authorize [Fredrikson] to apply for interim fees every sixty days. This shortening of the time provided by the Bankruptcy Code is a product of the implementation of this case (which includes more than 12 secured creditors, many of whom are substantially undersecured and have thus far been unwilling to accept reduced payments) and the risks attendant to the complexities and risks [sic] of this case, as well as the size of the retainer received.

This request [3] for leave to deviate from the Bankruptcy Code's [4] 120–day minimum frequency of interim fee applications is the one meritorious part of the proposal at bar. Congress explicitly intended to provide for more frequent application, where the circumstances of a given case warranted it. H.R.REP. No. 595, 95th Cong. 1st Sess. 330 (1977); S.REP. No. 989, 95th Cong., 2d Sess. 41–2 (1978); U.S.Code Cong. & Admin.News 1978, p. 5787; *In re Shelly's, Inc.*, 91 B.R. 803, 807 (Bankr.S.D.Ohio 1988).

The circumstances of this case support a grant of leave for more frequent interim fee applications, though not to the extent which Fredrikson has demanded. Debtor's schedules list 16 secured creditors holding security interests or lessor's rights in Debtor's rolling stock. Per the statements of

---

**3.** The Court reads the inclusion of this provision in the application as a request, rather than as an attempt to dictate the terms of the Court's approval of employment or its willingness to entertain more frequent applications. 11 U.S.C. § 331 provides for a frequency of interim fee applications every 120 days "or more often if

the Court permits." This provision vests the Bankruptcy Court with the exclusive power to set the frequency of fee applications, and does not permit deviations from the 120–day frequency absent specific leave of Court.

**4.** Specifically, § 331.

collateral value and debt amount in the schedule, the claims of at least 11 of these creditors are undersecured. Fredrikson credibly alleges that these creditors are reluctant to negotiate adequate protection agreements; this, in turn, will put substantial demands on counsel to defend motions for relief from stay. This assertion is not ill-founded; as of the date of this order, five secured creditors have filed motions for relief from stay, and others asserting the status of lessors have filed four motions for relief under 11 U.S.C. § 365.

Negotiations to settle these motions may result in the framework of a plan of reorganization, but the process will require a substantial investment of attorney time in the early months of this case. Other proceedings to date—the hit-and-miss process of finalizing arrangements for receivable collection, negotiation of cash collateral agreements, and motions for approval of the sale of real and personal property—have consumed, and will consume, more of counsel's attentions. Fredrikson's $25,-000.00 retainer will likely be exhausted quickly. While Fredrikson should have to bear risk of some substance in the prosecution of this reorganization, it is only fair to lessen that risk in the manner and degree explicitly contemplated by the Code: by a grant of leave to apply for allowance of compensation more frequently during the period of time when Debtor's reorganization will be either made or broken. Issues relating to the amount and time of payment on such allowances can be raised and treated at the hearings on these applications; at that time the Court can structure relief to balance Fredrikson's and the estate's competing claims to Debtor's current cashflow, under the circumstances which then prevail.

IT IS THEREFORE ORDERED:

1. That the Court declines to approve Debtor's employment of Fredrikson & Byron, P.A., on the terms and conditions set forth in the application filed on January 23, 1991.

2. That the Court will enter an order approving Debtor's employment of Fredrikson & Byron, P.A., upon that law firm's filing of an acknowledgement of, and consent to, a limitation of those terms and conditions which accords with the rulings in Sections I.—III. of this order.

3. That, if the Court approves Debtor's employment of Fredrikson & Byron, P.A. in accordance with Term 2 of this order, that law firm may apply for allowance of compensation and expenses at intervals of every 60 days, those intervals to commence with the date on which Debtor filed its Chapter 11 petition, for the first two such applications. Thereafter, the law firm may apply for allowance of compensation and expenses at intervals of every 90 days.