**In re PANNEBAKER CUSTOM CABINET CORP., Debtor.**

**COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF LABOR AND INDUSTRY, BUREAU OF EMPLOYER TAX OPERATIONS, Objectant,**

v.

**CUNNINGHAM & CHERNICOFF, P.C., and Mark Z. Greenberg, CPA, Respondents.**

**Bankruptcy No. 1–94–00955.**

United States Bankruptcy Court, M.D. Pennsylvania.

July 25, 1996.

Robert E. Chernicoff, Harrisburg, PA, for Debtor.

Leon P. Haller, Harrisburg, PA, trustee.

## MEMORANDUM

ROBERT J. WOODSIDE, Chief Judge.

Before me are the objections of the Commonwealth of Pennsylvania, Department of Labor and Industry, Bureau of Employer Tax Operations ("BETO") to the requests for payment submitted by counsel for debtor Pannebaker Custom Cabinet Corp. ("Pannebaker") and Pannebaker's court-approved accountant, and a motion for reconsideration related thereto. For the reasons stated below, BETO's objections will be sustained in part and overruled in part.

### Procedural history/factual background

Pannebaker filed a petition for relief under Chapter 11 of the Bankruptcy Code on June 7, 1994.

Pannebaker immediately filed an application to engage the services of Cunningham and Chernicoff, P.C. ("C & C") to represent it in its capacity as the Debtor-in-possession. The application disclosed that the fee relationship included a retainer paid to C & C in the amount of $20,000.00.

On June 10, 1995, Pannebaker and Corestates Bank, N.A., then Hamilton Bank ("Corestates"), filed a stipulation regarding the use of cash collateral, which was amended several times during the case ("Cash Collateral Stipulation"). The Cash Collateral Stipulation provided, *inter alia,* that Pannebaker "is hereby authorized and empowered to use Cash Collateral *only for expenses arising in the ordinary course of Debtor's business* in accordance with an approved budget ..." (emphasis added).

On July 1, 1994, Pannebaker filed an application to employ Mark Z. Greenberg, CPA ("Greenberg")[1] as certified public accountant for Pannebaker. The application disclosed that Pannebaker "has been charged a $10,000.00 retainer to Greenberg." Pursuant to Fed.R.Bankr.P. 2014, a copy of the application was transmitted to the United States Trustee. I entered an Order approving the employment on July 7, 1994.

During the course of the case, Pannebaker consented to relief from the automatic stay so that the primary secured creditors could pursue their state law rights and remedies with regard to Pannebaker's business assets. During the last few months of the Chapter 11 case, the United States Trustee moved for conversion of the case to one under Chapter 7, and Pannebaker twice agreed to voluntarily convert the proceedings.

On September 13, 1995, BETO filed an application for payment of administrative expenses, seeking payment of unpaid obligations related to unemployment compensation. On October 6, 1995, Pannebaker filed a reply opposing the relief requested in BETO's motion, contending that it had ceased doing business, contending that there were no funds available from which to make payment to BETO, and advising that it intended to convert the case within the next few days.

On October 6, 1995, C & C filed an application for payment of interim fees and expenses, seeking approval of payment of $23,732.00 for legal services and $1,048.62 for expense reimbursement. C & C again disclosed having received a retainer in the amount of $20,000.00, plus funds from which to pay a filing fee in the amount of $800.00. Though it was not clear from either C & C's application or Pannebaker's monthly reports, C & C's letter brief discloses that C & C received postpetition disbursements from Pannebaker in a total amount of $3,000.00.

On October 10, 1995, Greenberg filed an application for payment of interim compensation, seeking approval of payment to him of $21,321.50 for accounting services and $74.44 for expense reimbursement. Greenberg's application also disclosed postpetition receipts from Pannebaker in the amount of $10,000.00.

On October 17, 1995, BETO filed objections to the Professionals' requests for payment, contending that it has an administrative claim for taxes of the same priority as professional fees under Section 503(b) of the Bankruptcy Code, and that the funds paid to the Professionals postpetition should be disgorged and equally divided between administrative claimants. Additionally, BETO sought disgorgement of C & C's prepetition retainer.

On October 18, 1995, the United States Trustee filed limited objections to the Professionals' requests for payment, which it subsequently withdrew.

On November 2, 1995, the Professionals filed a consolidated reply to BETO's objections and requested an award of sanctions.

On November 3, 1995, I conducted a hearing on the requests for payment. The parties subsequently submitted letter briefs.

On March 8, 1996, I issued three Orders. First, I issued an Order converting the main bankruptcy case to one under Chapter 7. Second, I issued an Order denying BETO's motion for payment of its administrative

---

**1.** C & C and Greenberg are collectively hereinafter referred to as the "Professionals."

claim on the basis that any distribution in a case ripe for conversion should proceed in the Chapter 7 case according to the priorities applicable there. Third, I issued an Order in which I noted that the Professionals' papers were not clear as to the specific dates upon which they actually received disbursements from Pannebaker versus when they applied amounts previously received against outstanding or future fees and expenses. I also noted that Pannebaker's monthly reports failed to detail various of the postpetition disbursements to the Professionals. To clear these matters up, I directed the parties to file with the Clerk's office copies of all canceled checks representing disbursements to the Professionals, including all prepetition and postpetition disbursements. I also stated that:

> Respondents' position with regard to all disbursements specifically authorized by the Court, including properly disclosed retainers disbursed prepetition, will be preserved in the Chapter 7 proceedings; however, to the extent Respondents' applications must be considered requests for interim compensation or requests for *nunc pro tunc* approval of unauthorized postpetition disbursements, they will have to be denied for the same reasons as BETO's request for payment is being denied.

On March 18, 1996, the Professionals filed a joint motion for reconsideration of the third of the above-mentioned Orders. In the motion, the Professionals indicated that: 1) C & C received a prepetition retainer in the amount of $20,000.00 and accepted "additional post-petition retainer payments" of $2,000.00 on May 25, 1995, and $1,000.00 on June 13, 1995, paid into C & C's trust account; 2) Greenberg's application for appointment disclosed the fact that he was charging the estate for a retainer; 3) Greenberg was paid the "$10,000.00 retainer" in postpetition installments of $4,000.00 on July 14, 1994, $2,000.00 on September 9, 1994, $2,000.00 on September 16, 1994, $1,000.00 on June 9, 1995, and $1,000.00 on June 12, 1995; 4) the fees charged by both Professionals were reasonable; and 5) Pannebaker was operating under a cash collateral stipulation with Corestates Bank, which did not object to the payment of the fees.

On March 29, 1996, BETO filed a reply to the Professionals' motion for reconsideration, reiterating the grounds set forth in BETO's initial objection to payment of the Professionals' fees. BETO also requested a hearing on the motion for reconsideration.

On April 1, 1996, the United States Trustee filed comments with regard to the Professionals' motion for reconsideration. In the comments, the United States Trustee: 1) took issue with C & C's practice of applying its retainer against its fees prior to receiving approval of the fees; 2) contended that C & C's practice of accepting undisclosed postpetition disbursements from a debtor-in-possession violates the provisions of Fed. R.Bankr.P. 2016; 3) contended that Pannebaker's monthly reports reflect a payment to Greenberg in addition to those disclosed in the motion for reconsideration; and 4) took issue with the merits of the Professionals' position that the taking of postpetition disbursements on account of professional fees need not be noticed to creditors and other parties in interest and is not subject to contemporaneous approval by the bankruptcy court.

On May 20, 1996, the Professionals filed an answer to BETO's reply to their motion for reconsideration and a motion seeking an award of sanctions against BETO. The Professionals also filed a reply to the United States Trustee's comments.

On May 21, 1996, I made myself available for the hearing BETO had requested. BETO was not prepared, however, to present evidence; therefore, I entertained oral argument on the motion for reconsideration.

### Discussion

#### A. *Relevant statutory authority*

Section 327(a) of the Bankruptcy Code provides for the employment on approval of the bankruptcy court of professional persons by a trustee/debtor-in-possession, including the employment attorneys and accountants. Pursuant to Fed.R.Bankr.P. 2014, an application requesting approval of the employment must be filed and transmitted to the United States Trustee. With respect to the mere

employment of a professional person (as distinguished from the provision of compensation or disbursements thereto), there is no requirement for notice to creditors and parties in interest other than the United States Trustee.

Section 328(a) of the Bankruptcy Code relates to the terms of representation by professionals and states in part:

The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis. . . .

Sections 330 and 331 of the Bankruptcy Code and Fed.R.Bankr.P. 2016(a) set forth the procedural requirements for obtaining interim or final compensation for the services rendered by professionals whose employment previously has been approved by the court. Section 330(a) provides for a general award of compensation and states as follows:

(1) After notice to the parties in interest and to the United States trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, an examiner, a professional person employed under section 327 or 1103—

(A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and

(B) reimbursement for actual, necessary expenses.

To the extent a professional seeks compensation during the pendency of the bankruptcy case, i.e. "interim" compensation, the professional must further comply with the provisions of Section 331, which states as follows:

A trustee, an examiner, a debtor's attorney, or any professional person employed under section 327 or 1103 of this title may apply to the court not more than once every 120 days after an order for relief in a case under this title, or more often if the

court permits, for such compensation for services rendered before the date of such an application or reimbursement for expenses incurred before such date as is provided under section 330 of this title. After notice and a hearing, the court may allow and disburse to such applicant such compensation or reimbursement.

See generally David & Hagner, P.C. v. DHP, Inc., 171 B.R. 429, 435 (D.D.C.1994) (stating that "Section 331 permits such compensation [awardable under Section 330] to be paid on an interim basis during the pendency of the bankruptcy case"), aff'd, 70 F.3d 637, 1995 WL 650194 (D.C.Cir.1995).

Fed.R.Bankr.P. 2016 applies to both applications for final and interim compensation and requires that an entity seeking such relief from the estate "shall file an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested." Pursuant to Fed.R.Bankr.P. 2002(a)(7), notice of applications for interim or final compensation must be given to creditors and other parties in interest.

More generally, Section 363(b)(1) governs the use of property of the estate by a debtor-in-possession outside the ordinary course of business as follows:

The trustee [or debtor-in-possession], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

Fed.R.Bankr.P. 2002(a)(2) further requires a twenty day notice to creditors and other parties in interest of the proposed use, sale or lease of property outside the ordinary course of business.

Finally, Section 503 of the Bankruptcy Code places the postpetition claims of BETO and the Professionals within the category of administrative expense claims and provides the conditions for their allowance. Section 507 establishes the equal priority of such administrative expense claims.

## B. BETO's standing

■ In their papers responding to BETO's objection to payment of their fees, the Professionals questioned BETO's standing to ob-

ject. BETO is a priority creditor and an administrative claimant in this case, generally entitled pursuant to Fed.R.Bankr.P. 2002 to notice of applications for compensation of professionals under Section 330, requests for interim compensation under Section 331, and the proposed use of property outside the ordinary course of business under Section 363(b). As such, BETO had appropriate standing to object to the Professionals' applications.

### C. The timing of disbursements to the Professionals

In my Order dated March 8, 1996, I sought clarification of the specific dates on which disbursements were made to the Professionals and the specific amounts of each disbursement. Pannebaker's monthly reports did not disclose all such disbursements to the Professionals, and the fee materials submitted by the Professionals were unclear as to when amounts were disbursed from Pannebaker to the Professionals versus when each professional disbursed amounts from trust to their own account in payment for services rendered. The Professionals disclosed such dates in their motion for reconsideration and in a subsequent letter, and, although BETO requested and obtained an opportunity for discovery and a factual hearing, BETO presented no evidence which would call the Professionals' representations into question. Additionally, the Professionals reported that there was an error in Pannebaker's monthly reports reflecting a $4,000.00 disbursement to Greenberg which never was actually made, explaining the discrepancy identified by the United States Trustee. Again, upon opportunity for hearing, no evidence was presented to the contrary. Under the circumstances, I accept the Professionals' representations as to the times and amounts of the relevant disbursements.

### D. Receipt by Professionals of prepetition retainers

#### 1. The nature of C & C's retainer

■ The case law regarding retainers generally identifies two broad categories: "classic" and "special" retainers. In case of a classic or "earned on receipt" retainer:

> a client agrees to pay a fixed sum in exchange for the attorneys promised availability to perform legal services that may arise during a specific period of time. An essential characteristic of the classic retainer is that it is earned entirely by the attorney upon payment, with the client retaining no interest in the funds thereafter.

In re Renfrew Center of Florida, Inc., 195 B.R. 335, 338 (Bankr.E.D.Pa.1996).

■ The special retainer comes in two varieties: a security retainer and an advanced fee retainer. In the case of a security retainer:

> the attorney holds the same to secure payment of fees for future services. The funds do not constitute a present payment but instead remain the property of the [d]ebtor until the attorney applies it to charges for services actually rendered, normally after the submission and approval of an application for compensation.

Renfrew, 195 B.R. at 338. In the advance fee retainer arrangement,

> the attorney receives payment in advance for contemplated legal services and depletes the prepaid fund as services are rendered. Advance fee retainers differ from security retainers in that ownership of the funds is intended to pass to the attorney at the time of the payment.

Renfrew, 195 B.R. at 338–39.

■ In determining what category a specific retainer falls within, courts generally review the description contained in the professional's application for employment, the terms of any retainer agreement, and testimony of the debtors and professionals. See generally Renfrew, 195 B.R. at 340. The general rule is that, unless shown to be otherwise, a retainer constitutes funds held in trust for the benefit of the debtor, i.e., a security retainer. See In re Office Products of America, Inc., 136 B.R. 964, 970 (Bankr. W.D.Tex.1992); see also In re Printing Dimensions, Inc., 153 B.R. 715, 719 (Bankr. D.Md.1993) (citing cases). To the extent a professional seeks a determination that a re-

tainer is a classic, flat fee retainer or an advance payment retainer, the burden rests with the professional to so establish. *In re Mondie Forge Co.,* 154 B.R. 232, 238 (Bankr. N.D.Ohio 1993).

In the instant case, C & C's application for appointment disclosed only the fact of the payment of a retainer to C & C, but did not provide any description of the retainer such as might support a determination that it was not of the security type. Nor did C & C present any evidence to meet its burden of establishing a classic, flat fee retainer or an advance payment retainer. Under the circumstance, the retainer to C & C will be deemed to be of the security type. *Compare In re Saturley,* 131 B.R. 509, 515 (Bankr.D.Me.1991) (characterizing attorney's argument that retainer was an "earned on receipt" retainer rather than a security retainer as a "convenient fallacy" in light of the actual nature of the retainer and the method by which it was administered).

### 2. *Disgorgement of a pre-petition retainer*

BETO seeks disgorgement of the prepetition security retainer paid to C & C, contending that said funds should be recovered for the benefit of the estate and redistributed pro rata among administrative claimants.

A prepetition security retainer is a traditional, valid and proper means for an attorney for a Chapter 11 debtor-in-possession to secure some assurance of future payment for valuable services rendered during the course of a bankruptcy case. Such funds

> are delivered essentially to serve as collateral security for subsequent payment of allowed fees, thus transforming the attorney into a secured creditor with a possessory perfected security interest in such monies to the extent that the retainer covers fees which are ultimately approved by the Court for services performed.

*In re Baltic Associates, L.P., slip op.,* 1994 WL 791634 (Bankr.E.D.Pa. Mar. 16, 1994) (citing 13 Pa.C.S. § 9304); *see also In re North Bay Tractor, Inc.,* 191 B.R. 186, 187

(Bankr.N.D.Cal.1996) (stating that an attorney's interest in a security retainer "is in the nature of a security interest, assuring the attorney of a minimum fee in the case"); *Printing Dimensions,* 153 B.R. at 719 (same); *see generally In re Cal–Inland, Inc.,* 124 B.R. 551, 553 (Bankr.D.Minn.1991) (characterizing use of prepetition retainer as a standard practice embodying inherent safeguards).

Pursuant to Section 329 of the Bankruptcy Code, prepetition retainers are subject to disgorgement if they are excessive or unreasonable. *Printing Dimensions,* 153 B.R. at 720. Additionally, an unused portion of a prepetition retainer may be subject to disgorgement, depending upon the nature of the retainer. *See In re Prudoff,* 186 B.R. 64, 66–67 (Bankr.E.D.Va.1995).

In the case before me, BETO has not identified any of the traditional grounds for disgorgement of a prepetition retainer—it has not alleged or established that the $20,000.00 retainer paid to C & C was excessive or unnecessary or that there remains any unused portion thereof. BETO merely attempts to expand upon these grounds for disgorgement, arguing that prepetition retainers should be subject to disgorgement to achieve parity among administrative claimants, even if the retainer is not excessive or unreasonable. BETO has cited no cases to support this novel proposition, which fails to take into account C & C's superior priority in the specific prepetition retainer.[2] *See generally In re Hohenberg,* 191 B.R. 694, 701 (Bankr.W.D.Tenn.1996) (distinguishing prepetition retainer from administrative expense claim); *Printing Dimensions,* 153 B.R. at 719 (stating that counsel "will not be required to share a prepetition retainer with other administrative claimants, where either the retainer is treated as security or the retainer is held in trust"). With respect to fees subsequently approved by Court, C & C, as a secured party, prevails over BETO, as an unsecured, administrative claimant.

---

**2.** The issue of the priority of the interest of an attorney for a debtor-in-possession most often arises when it is brought into question by a

secured creditor, claiming a superior *secured* interest. *See, e.g., Renfrew,* 195 B.R. at 335.

■ Since BETO has not questioned the amount or reasonableness of the prepetition retainer to C & C, its request for disgorgement of same will be overruled. I do, however, express discomfort with C & C's practice of applying a prepetition retainer against fees as they are earned rather than upon receiving an actual award of the fees pursuant to Sections 330 or 331. At least arguably, a professional seeking to draw on a prepetition security retainer prior to receiving court approval pursuant to Sections 330 should also provide notice of that intent to creditors and other parties in interest. Such a draw may entail a transfer of the debtor's interest in the retainer, and such a transfer outside the ordinary course of business [3] is governed by Section 363(b) of the Bankruptcy Code, which requires notice under Fed. R.Bankr.P. 2002, and/or Section 331, governing awards of interim compensation, which also requires notice under Fed.R.Bankr.P. 2002. *See generally Printing Dimensions,* 153 B.R. at 723 (stating that "[t]o allow application of the retainer without bankruptcy court approval would emasculate the specific requirements of § 331 for an award of interim compensation"); *In re Burnside Steel Foundary Co.,* 90 B.R. 942, 944 (Bankr. N.D.Ill.1988) (stating that "to allow an attorney for a debtor to draw against a retainer at will and without prior court approval is a *de facto* emasculation of § 331" (quoting *In re Chapel Gate Apartments, Ltd.,* 64 B.R. 569, 573 (Bankr.N.D.Tex.1986))). The counterargument is that, under applicable state law, the estate loses its interest at the time the fees are earned as opposed to when they are approved; therefore a postpetition draw on a prepetition retainer does not involve a transfer of property of the estate subject to Section 363(b) or a disbursement of compensation "from the estate" subject to Section 331.

This counterargument continues that, since fees paid to professionals are subject to disgorgement if they are determined to relate to services that were unreasonable or unnecessary, there is no significant prejudice to the estate from the unsupervised draw. *But see Printing Dimensions,* 153 B.R. at 723 (stating that "[t]he court's fee disgorgement authority under 11 U.S.C. § 329(b) is not an adequate substitute for the court's prior approval of fees for services rendered").

Local practice differs as to the propriety of pre-approval draws on prepetition retainers, *see, e.g., In re Durastone Co., slip op.,* 1994 WL 116183 (Bankr.D.R.I. Mar. 14, 1994) (comparing local practice between the Eastern District of Massachusetts and the District of Rhode Island), and I do not feel it necessary or appropriate to decide the issue definitively at this time as the reasonableness and necessity of C & C's fees have not been questioned in this case and the propriety of such pre-approval draws is only a collateral issue among many, upon which the parties have not focused their briefs and argument. I will direct, however, that professionals who intend to draw on prepetition retainers prior to approval of their fees at a minimum disclose such intent pursuant to Fed.R.Bankr.P. 2014(a) in their applications for employment as part of the terms and conditions of their retention. Such disclosure will provide an appropriate opportunity for review and comment by this Court and the United States Trustee, and, should the notice and approval issue become central in an appropriate case, it may become ripe for a dispositive ruling.[4]

### E.   *Postpetition disbursements to C & C*

■ In addition to the $20,000.00 retainer accepted by C & C, the law firm also accept-

---

**3.** As further discussed below, payment of compensation to professionals is outside the ordinary course of a debtor-in-possession's business affairs. *In re Addison Properties Ltd.,* 185 B.R. 766, 769 (Bankr.N.D.Ill.1995).

**4.** One of the problems identified by the United States Trustee in this case is that the applications for employment of both C & C and Greenberg were not specific in disclosing the exact terms and conditions of the respective employments. For example, C & C's application did not indicate an intent to accept additional postpetition

retainers, and Greenberg's application was not specific in indicating that the retainer he was accepting was a postpetition retainer. Counsel should be clear in identifying the precise terms and conditions under which professionals will be employed, including the specific nature of all retainers and the manner in which the professionals intend to apply them. Additional requirements must be met where the professionals intend to accept postpetition retainers, which are further discussed below.

ed postpetition disbursements from Panne-baker totalling $3,000.00. C & C did so without seeking or obtaining approval of interim disbursements under the relevant provisions of the Bankruptcy Code.

■ Generally professionals retained pursuant to Section 327 must file an application for compensation *prior* to allowance and payment of fees. *See In re Genlime Group, L.P.*, 167 B.R. 453, 455 (Bankr.N.D.Ohio 1994) (noting that the unambiguous language of Section 331 requires notice and a hearing preceding disbursements to professionals).

In a number of cases, professionals have asked bankruptcy courts to approve procedures for compensation that do not require direct court approval of interim disbursements from a debtor-in-possession. For example, in *In re Perrysburg Marketplace Co.*, 176 B.R. 797 (Bankr.N.D.Ohio 1994), the bankruptcy court performed a careful analysis of just such a request, whereby a debtor-in-possession would make monthly payments into a trust account held by its attorneys for payment of the attorneys' fees and expenses. In disapproving the arrangement, the bankruptcy court noted initially that "[p]ostpetition [p]ayments are not analogous to a prepetition retainer agreement." The bankruptcy court further noted that proposed terms of retention such as postpetition payments "are fundamentally at odds with the Congressional intent expressed in Bankruptcy Code sections 330, 331 and 503." *Perrysburg*, 176 B.R. at 799. The bankruptcy court stated:

[m]ore specifically, § 331 restricts a professional's right to receive postpetition disbursements from the estate. Section 331 requires notice and a hearing, plus allowance by the Court prior to the disbursement of professional fees from the estate.

The fact that the [attorneys] agreed to deposit the proposed [p]ostpetition [p]ayments into a trust account rather than into its general account does not make a material difference in this Court's analysis. "[T]he central question is whether the estate should be allowed to part with funds making them at least temporarily and

nominally unavailable for payment of post-petition business expenses."

*Perrysburg*, 176 B.R. at 799.

Second, the bankruptcy court held that Section 363(b)(1) proscribed the proposed payment method. It stated:

Section 363(b)(1) permits a debtor to use property of the estate, "other than in the ordinary course of business", after notice and a hearing. The DIP has only provided notice of the Application to the Court and the UST. This procedure fails to satisfy the express requirements of Section 363.

*Perrysburg*, 176 B.R. at 799 (citations omitted); *see also* Fed.R.Bankr.P. 2002(a)(2) (requiring twenty-day notice to all creditors prior to a debtor's use of estate property other than in the ordinary course of business).

Third, the bankruptcy court held that the contemplated terms of retention were not reasonable. The bankruptcy court quoted *In re Fitzsimmons Trucking, Inc.*, 124 B.R. 556 (Bankr.D.Minn.1991), stating:

a debtor in Chapter 11 needs all the control over post-petition revenues that it can get. Reorganizing businesses have to negotiate ... adequate protection payments to secured creditors; to satisfy skittish employees by maintaining payroll, benefits, and working conditions; to keep taxing authorities satisfied, by avoiding accrual of post-petition liabilities; and, usually, to meet current trade expenses on a cash-payment basis. These cash needs remain constant throughout the case, and are critical to its success. Locking substantial funds into escrow for the benefit of counsel for any period of time more than the first months of the case deprives the debtor of that much more flexibility in meeting these needs and particularly in meeting the 'emergency' or 'unanticipated' costs that crop up in Chapter 11 cases with distressing frequency.

*Perrysburg*, 176 B.R. at 799–800 (quoting *Fitzsimmons*, 124 B.R. at 558).

Fourth, the bankruptcy court acknowledged a line of cases typified by *In re Knudsen Corp.*, 84 B.R. 668 (9th Cir. BAP 1988), in which the courts have permitted postpetition disbursements to professionals prior to

notice and a hearing under "rare circumstances." The bankruptcy court, however, felt that the attorneys' "bare assertions" concerning the benefit of such payments fell well short of the quantum of unusual circumstances required to approve the arrangement. *See Perrysburg,* 176 B.R. at 800.

Finally, the bankruptcy court discussed the balance struck by the Bankruptcy Code sections requiring court approval of interim compensation. It stated:

> [t]he Code ... deals differently with fees of professionals than with payment of other people who provide services to the debtor. Employees do not need court permission to be paid and are usually paid as part of the ongoing operation of the business.... It is only those who deal with the actual reorganization of the debtor (rather than the ongoing business of the debtor) who are required to be employed under § 327 and whose applications for payment must be approved by the Court. It is only these professionals who cannot seek payment more often than once every 120 days unless the Court otherwise orders. It is clearly the intent of Congress that professionals involved in the reorganization effort itself be carefully scrutinized, that their dealings be open to the public, that they maintain the distance from the debtor that is not possible for any employee, and that they not drain the debtor of the capital that it needs to fund its reorganization.

*Perrysburg,* 176 B.R. at 800 (quoting *In re Pacific Forest Indus., Inc.,* 95 B.R. 740, 743 (Bankr.C.D.Cal.1989)).[5]

■ I am in agreement with most of the points raised by the *Perrysburg* court. I find that the customary practice of obtaining a prepetition retainer is, in most cases, sufficient inducement and protection for bankruptcy counsel. *See generally Cal–Inland,* 124 B.R. at 553 (stating that "[t]here is simply no indication, of record or otherwise, that

the tacit discouragement of post-petition retainers has prevented business debtors in need of Chapter 11 relief from retaining able counsel, or from obtaining confirmation of reorganization plans when those debtors were otherwise capable of bankruptcy rehabilitation"). Therefore, in most cases, approval of procedures allowing unsupervised postpetition disbursements is not warranted.

This case is on all fours with the *Perrysburg* case in regards to the taking of postpetition disbursements by C & C; indeed, the only material difference is that C & C did not seek prior court approval of the disbursement procedure before accepting disbursements from Pannebaker.

C & C repeatedly cites the *Knudsen* case, 84 B.R. at 668, in support of its conduct in accepting unauthorized postpetition disbursements from Pannebaker's estate. The circumstances of the instant case, however, facially do not meet a number of the requirements set forth in *Knudsen,* not the least of which is the requirement that "the fee retainer procedure is, itself, the subject of a noticed hearing *prior to any payment thereunder.*" *Knudsen,* 84 B.R. at 672–73 (emphasis added). The core problem in this case is that, by failing to apply for permission to accept postpetition disbursements, C & C has inappropriately removed the Bankruptcy Court from the prior review process.[6]

C & C argues that such conduct is warranted, indicating that there is a difference under both Section 331 and *Knudsen* between a "postpetition retainer" and a "postpetition disbursement." Its argument continues that the requirement for court approval does not relate to funds transferred from the debtor-in-possession to its counsel's trust account (a "postpetition retainer"), but rather applies to either a direct payment from the debtor-in-possession to counsel or the final disbursement from the attorney's trust account to its own op-

---

5. A litany of additional policy grounds for the rarity of allowing unauthorized postpetition disbursements to bankruptcy counsel are set forth in *Cal–Inland,* 124 B.R. at 553–54.

6. The bankruptcy court's role in determining the allowability of an award of interim compensation

is not merely perfunctory. Among other factors, the court must consider whether the estate contains sufficient funds such that the award to the professional will not jeopardize claims of equal priority held by others. *See, e.g., In re Alberto,* 121 B.R. 531, 538 (Bankr.N.D.Ill.1990).

erating account (a "postpetition disbursement"). Thus, C & C vigorously maintains on the one hand that its possession of the "postpetition retainer" insulates it from the otherwise equal claims of other administrative claimants, and, on the other hand, that its postpetition acceptance of those very same funds is of such minimal consequence that no prior court approval is necessary. This cake-and-eat-it-too logic completely ignores the decisive impact on priorities of the disbursement from the debtor-in-possession to counsel and is inconsistent with both the language and spirit of the relevant authorities. *See Perrysburg*, 176 B.R. at 799 (stating that "[t]he fact that the [attorneys] agreed to deposit the proposed [p]ostpetition [p]ayments into a trust account rather than into its general account does not make a material difference in this Court's analysis"). A postpetition retainer is merely a form of postpetition disbursement, and the terms "disbursement," "payment" and "compensation" as utilized in the relevant authorities quite obviously relate to the transfer from the debtor-in-possession to counsel in the first instance. *Id.; see also Genlime*, 167 B.R. at 456 (finding postpetition disbursements to professionals subject to Section 331 even where characterized as "retainer" payments); *Cal–Inland*, 124 B.R. at 554; *In re Shah Int'l, Inc.*, 94 B.R. 136, 137 (Bankr.E.D.Wis.1988) (stating that "an attorney could *not* receive a *postpetition* retainer either in the form of cash or as a mortgage on any property without notice to all creditors and approval of the court" (emphasis in original)); *see generally In re DeRuskin Enterprises, Inc.*, slip op., 1993 WL 594354 (Bankr.E.D.Pa. Feb. 16, 1994) (stating that "post-petition payment of retainers prior to allowances of compensation in fee applications, unless specifically allowed by the court, are never appropriate").

█ Even if the payments to C & C could be characterized as "postpetition retainers," even if such retainers were not subject to the provisions of Section 331, and even if C & C had disclosed in its application for employment an intent to accept such postpetition retainers, they still could not be condoned.

Section 328 of the Bankruptcy Code authorizes retention of professionals under any reasonable terms and conditions of employment (including on a retainer); however, that section must be read in conjunction with other relevant provisions of the Bankruptcy Code, including Section 363(b), which requires notice to creditors and other parties in interest and an opportunity for a hearing prior to the use of estate funds outside the ordinary course of business. *See Addison Properties*, 185 B.R. at 769. As previously noted, payments to professionals are treated separately and specifically under the Bankruptcy Code and are thus without question payments outside the ordinary course of a debtor-in-possession's ordinary financial affairs. *Id.*

For these reasons, regardless of whether they are characterized as a retainer or as postpetition disbursements, I find that the unauthorized payments to C & C in the amount of $3,000.00 are: 1) in violation of the Code provisions and related rules requiring prior court approval of postpetition disbursements from a debtor-in-possession to professionals; 2) proscribed by Section 363 in absence of proper notice and opportunity for hearing; 3) part of an unsupervised fee payment arrangement that is not reasonable; 4) taken in absence of "rare circumstances" that might warrant an unusual payment arrangement; and 5) impact upon the integrity of the bankruptcy system by subverting specific requirements for the approval of disbursements from the estate to a professional and for use of estate property outside the ordinary course of business.

█ The fact that Pannebaker entered into a Cash Collateral Stipulation with Corestates Bank does not change this result. First, the stipulation authorized the use of cash collateral only "in the ordinary course of business," and the postpetition payment of professionals clearly is not made in the ordinary course of business. *Perrysburg*, 176 B.R. at 799; *see also Addison*, 185 B.R. at 769. Second, a cash collateral stipulation does not obviate the requirements of court approval contained in Sections 330, 331 and 363 of the Bankruptcy Code. Funds subject

to a security interest remain property of the estate; indeed, they are often the debtor-in-possession's lifeblood during the period during which it is reorganizing. Regardless of their status as collateral, such funds, like unencumbered funds, may be disbursed to professionals during the pendency of a bankruptcy case only in accordance with the relevant provisions of the Bankruptcy Code.

Finally, C & C argues that a wide range of practical considerations, most of which relate to the protection of its own interest in collecting its fees, justify its postpetition fee practices. The simple answer is that providing protection for C & C's interest impacts the interests of other claimants, particularly, in this case, BETO, which has gone unpaid for several quarters during which Pannebaker was operating. Since its interest will impacted, the Bankruptcy Code and Rules provide BETO (and other creditors and parties in interest) with the opportunity to receive notice and demand a hearing prior to disbursement to C & C.

It is an unfortunate fact of bankruptcy practice that competent, hardworking professionals sometimes do not receive full and fair compensation for valuable services appropriately rendered. Working within the framework of the Bankruptcy Code and Rules, this Court always has done its best to ensure that, where possible, fair compensation is received. I am unwilling, however, to stray beyond the bounds of the Code and Rules to do the same. The circumstances of this case plainly warrant disgorgement by C & C of $3,000.00 in unauthorized postpetition disbursements.

### F. *Disbursements to Greenberg*

██ Like C & C, Greenberg also accepted postpetition disbursements from Pannebaker. Because he did not obtain prior court approval after notice and an opportunity for a hearing, in a number of ways Greenberg stands in much the same shoes as C & C with respect to those postpetition disbursements. To justify retaining the disbursements, Greenberg relies upon Pannebaker's application to employ him, which discloses

that "the debtor has been charged a $10,-000.00 retainer." Applications for employment, however, pursuant to Fed.R.Bankr.P. 2014, are only filed and transmitted to the United States Trustee; they are not served upon creditors and other parties in interest. Additionally, Greenberg's application was not specific as to whether the retainer charged was a prepetition or postpetition retainer, whether payment actually had been made on the retainer, or how, specifically, payment was to be made. Finally, Greenberg did not file a separate motion to allow postpetition disbursements to him, which would have been served upon creditors and other parties in interest and would have provided this Court with an opportunity to perform the appropriate review of such payments consistent with Sections 331 and/or 363(b)(1) of the Bankruptcy Code.

I do find, however, that Greenberg's circumstances are distinguishable from C & C's in several material respects. First, Greenberg is not an attorney and was not the person responsible to see to it that the procedure for payment of a postpetition retainer was subject to notice and a hearing and received specific prior Court approval. Second, Greenberg is not in the same position as counsel with respect to obtaining a prepetition retainer; oftentimes services of a specialized accountant such as Greenberg are not retained until some time after the commencement of the case when it becomes clear that such services are needed. Third, $8,000.00 or the bulk of the funds received by Greenberg was disbursed to him during June through September, 1994, a time when Pannebaker was doing business and paying other administrative expense claimants.[7] Therefore, there is no evidence of prejudice to creditors and other parties in interest from the payments. Fourth, the reasonableness and necessity of the services provided has not been questioned, and my independent review of Greenberg's fee application materials leads me to conclude that the services provided were reasonable and necessary. Fifth, the retainer accepted by Greenberg constitutes a reasonable amount and is

---

7. BETO indicated both in its motion for payment of administrative expenses and in chambers that

Pannebaker's failure to remit payment to it began in January, 1995.

far less than the fees for actual services provided. Finally, Greenberg's application for payment discloses the fact of the retainer, was noticed to creditors and parties in interest, and fairly may be treated as a request for retroactive approval of the postpetition disbursements to him.

While I have found no cases discussing retroactive approval of a postpetition retainer, I note that the cases authorizing *nunc pro tunc* approval of the employment of counsel have been quite strict. *See, e.g., In re F/S Airlease II, Inc. v. Simon*, 844 F.2d 99, 105 (3d Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988). Nevertheless, a number of the above-mentioned factors fit within the framework of conditions under which *nunc pro tunc* approvals of employment have been granted, and, in my judgment, warrant retroactive approval of disbursements to Greenberg in the amount of $8,000.00.

Greenberg, however, will be required to disgorge the $2,000.00 which he received from Pannebaker in June and July, 1995, because such payments, given their timing, do not fit as easily within the framework which would warrant retroactive approval,[8] and because I feel some degree of disgorgement is warranted under the circumstances.

### G. *Disgorgement*

BETO contends that funds disgorged in this case should be returned to the estate for division among administrative claimants. My directive, however, will be limited to requiring the Professionals to turn the appropriate funds over the Chapter 7 trustee. *See In re Mondie Forge Co.*, 154 B.R. 232, 239 (Bankr.N.D.Ohio 1993). The proper distribution of said funds will be a matter determined in the first instance by the Chapter 7 trustee, subject to notice and opportunity for a hearing by creditors and other parties in interest.

### H. *Sanctions*

C & C and Greenberg have moved for sanctions against BETO, contending that BETO has made inappropriate arguments and has "utilize[d] the Court's valuable time for issues which a private litigant would never pursue given the small dollar amounts involved versus the considerable time expended."

The second of these contentions deserves little mention. The taking of unauthorized postpetition disbursements by counsel is a serious matter, regardless of the dollar amount. Indeed, C & C has indicated that it is its general practice to engage in such conduct, and, in the context of multiple cases, the dollar amounts certainly become significant. Additionally, BETO, as a frequent victim of failed Chapter 11 cases, has a particular interest in maintaining the postpetition parity of its claims, where possible, with the claims of professional administrative claimants.

There is a degree of merit in the Professionals' claim that certain of BETO's legal contentions were not well founded. Indeed, I have not even discussed BETO's citation of plan confirmation provisions of the Bankruptcy Code because of their lack of relevance to the issues at hand. Under the circumstances, however, I do not find an award of sanctions appropriate.

### Conclusion

Based upon the foregoing, it is my conclusion that, in order to accept postpetition disbursements from a debtor-in-possession, regardless of whether they are in the nature of actual payment or a retainer, professionals must: 1) first file a motion specifically requesting approval of such disbursement; 2) provide proper notice to creditors and other parties in interest of such motion so as to allow an appropriate opportunity for a hearing; and 3) obtain actual Court approval of the desired disbursement prior to acceptance.

---

8. These payments were made during a time when BETO was not receiving appropriate remu-

neration from Pannebaker.